This morning is 22-50775 consolidated with 22-50778. Mr. Cole. Thank you, Chief Judge Richmond, and may it please the Court. The case underlying this of Texas law. But the resolution of this appeal turns upon application of familiar principles of sovereign immunity and standing. Applied here, the Court should conclude that plaintiffs cannot overcome the sovereign immunity of the Attorney General or the Secretary of State under this Court's precedence through Ex parte Young because the Secretary and Attorney the challenge provisions of law. Alternatively, the Court should also hold for similar reasons that plaintiffs cannot meet the traceability element of Article III standing. Now, before I go further on the sovereign immunity or standing issues, I wanted to pause just briefly on the appellate jurisdiction issues raised by my friends on the other side. But I don't think it should detain us for very long because for at least three decades, it has been black immediately appealable under the collateral order doctrine. Notably, my friends on the other side don't really dispute that venerable proposition. Indeed, one of the plaintiffs groups here actually agree that appellate jurisdiction is proper here. So the remaining argument here on the appellate jurisdiction issue from the two other parties is essentially that because this appeal won't resolve every single claim against the Secretary and Attorney General in the district court, there's no appellate jurisdiction to consider the 1983 claims at issue here. The trouble with that argument, though, is that the case they cite to support it, the Phillips case, actually doesn't support that idea. In fact, Phillips noted that this Court has asserted appellate jurisdiction over cases where parties asserted immunity from some, but not all, claims in the district court. There isn't a fair reading of Phillips, and there are other authorities that rely on bank pass. It seems to me a fair reading of Phillips giving me a reaction is that, in fact, it is relying very heavily on the whole case issue. But there is this caveat that all the claims aren't subject to sovereign immunity. But if sovereign immunity is imposed, the other claims will disappear because of sovereign immunity. So it seems to me Judge Elrod drops that footnote about bank pass. But the text of the opinion really is talking about immunity from the whole case. Yes? No, I don't think so, Judge Southup. I didn't think you'd say yes, but tell me why not. I don't think so because I'd first point to that footnote that recognizes that this Court has, in fact, asserted jurisdiction over those cases that you're talking about, those types of cases. And the entire suit language that Judge Elrod is pointing to in Phillips, I don't read that opinion, the text of the opinion, as you say, to go further, to say that you must assert immunity from every single issue in the district court, and we did that here, but what they wanted to say is that you have to assert immunity from every single issue in the Court of Appeals. There's no case that stands for that proposition to my mind. And I'd note, actually, that the Supreme Court has rejected that exact argument in the qualified immunity context. There's a case from 96, Barons v. Petallier, 516 U.S. 229. It was written by Justice Scalia. The exact argument is rejected in the qualified immunity context. And why is that relevant here? Because in Metcalfe and Eddy, the Supreme Court, when they announced that the collateral order doctrine does apply to orders denying sovereign immunity, it reasoned to that proposition from qualified immunity cases like Mitchell v. Forsyth and others. So I don't think there's any case, including Phillips, that supports their argument here that — Can you give me sovereign immunity opinion from the Supreme Court, the mix of holding that you want us to make here? I know that the Court has addressed it specifically in the sovereign immunity context, but certainly there's no case that says the opposite. I mean — It certainly refers to an entire case a fair amount of times. It talks about the reason for the collateral order doctrine. Anyway, there's ambiguity, it seems, to be in the precedent, and you tell us there isn't. Why don't you keep going? Sure. I mean, if you're troubled by that, I don't think there's any precedent in this Court that actually holds that you have to assert immunity. In fact, sovereign immunity is claim-specific in a sense, because you wouldn't say, for example, just because one statute, say, abrogates or waives sovereign immunity that it's then waived or abrogated for another claim. You have to look at the specific claim at issue, and that's exactly what you've got here. There's — it's black-letter law under Metcalf and Eddy that orders denying sovereign immunity are immediately appealable under the collateral order doctrine. That's exactly what you have here. Recall, of course, that the district court's order denied our sovereign immunity arguments across the board. I'll turn now after — unless there's further questions on the appellate jurisdiction issue, I'll turn to the merits of the appeal, and that is I'll start with the sovereign immunity argument, is that the plaintiffs cannot rely on the ex parte Young exception here because the secretary and attorney general lack the sufficient enforcement connection. Now, we've gone through in the brief the provision-by-provision analysis to each of the challenge provisions demonstrating why the secretary and attorney general lack the enforcement connection. I think the main dispute here can be characterized as sort of falling into plaintiffs' arguments about three types of activities that they intend the secretary or attorney general have that allow them to overcome sovereign immunity, that is, prescribing forms, promulgating rules, and reporting violations of law. I don't think any of those gets them over the ex parte Young hump, and I'll start with prescribing forms. I think the important thing to note about this particular alleged piece of enforcement authority is, is that the gravamen of plaintiffs' complaints here is that they won't be able to access the franchise if, say, they're forced to put certain requirements on mail-in balloting forms or other types of forms. Their complaints are replete with citations and allegations stating that the gravamen of their complaint is that they'll be not provided access to the franchise. It's not, as was an issue in TDP, Texas Democratic Party v. Abbott, which I understand is a challenge to the forms itself. And it's not just my word making that distinction. This Court made that distinction just last year in Richardson, where, where the Court said, said that when you have a challenge to the forms themselves as opposed to how local officials use those forms, that is the category of cases involving Texas Democratic Party. But when, as here, you have a challenge to how local officials hear the early voting clerks or the signature verification committees or the early voting ballot board, if the challenge is to how they actually use those forms, then Ex Parte Young doesn't apply because the local officials enforce them, not the secretary. I'll note also that, sort of logically, SB 1 in Section 5.07, and that's an amendment to Texas Election Code 86.001F, that amendment actually acts as an amendment to Section 5.07 and expressly tasks the early voting clerks with rejection, with rejecting mail-in ballot applications that don't contain the required information by SB 1. So even if the district court here were to say, we're going to enjoin the secretary from, say, making a space on the form under Section 5.03 or 5.08 of Section, of SB 1, that wouldn't get them the, the relief they need. Their complaint is that they won't be able to get access to the franchise. But if that's what they're concerned about, enjoining the secretary from creating a form does not relieve the early voting clerks and other local officials of their independent legal obligation under Texas law to reject those forms. So the relief they want couldn't be had by the injunction they're requesting, which is, again, why Ex Parte Young doesn't get them over the hump there. I'll turn next to the, the second bucket, which is promulgating rules. But I think that one, this Court has rejected at least three times, most recently two weeks ago in Osterwich, that the secretary's duty to provide interpretive assistance or guidance or other rules doesn't provide the sufficient enforcement connection. Osterwich, I think, is, is, as I said, the most recent case, but that was also, that, that argument was also addressed in Tara and in Richardson. In fact, in Tara, the Court rejected this exact argument with respect to one of the provisions they challenge here, namely the Section 3.15, which, of, of SB 1, which bars single-choice ranked voting. So the promulgation of rules, interpretive guidance, assistant, this Court has made clear again and again that that can't help the claims. And that is true, that, that, that applies to several of their claims under Article 3, Article 4, and Article 2 of SB 1. The final category that we have here for the secretary is the reporting of violations of law. Now, that doesn't get them there either, because merely reporting a violation of law to another state official or a district attorney does not constitute enforcement. This Court has said over and over again that enforcement means compulsion or constraint. And merely transmitting information to another state official does not constitute compulsion or constraint. It doesn't compel or constrain the plaintiffs, and that is a problem for them here. This Court, I think they, they make some arguments that there is some sort of, I think in their colorful language, enforcement matrix. I don't think that is an accurate description of how Texas law works here. There is an enforcement matrix. State officials, like district attorneys, and prior to Stevens, the attorney general, are constitutional officers that have an independent obligation under the Constitution to, the Texas Constitution, to make judgments about what cases to bring. And just because there's a, a referral of a potential violation of law, that doesn't mean the attorney general or the district attorney is going to prosecute that case. They have to exercise their judgment about the facts. And this Court has said, in Texas Democratic Party v. Hughes, that if a but-for cause is not enough, is not enough under YUM to get them over the enforcement hump, and that's all they can say here. That's all they can say is that, well, maybe there's going to be some referral of information to another State official, and then that State official is going to enforce it against us. Again, that's not enough. That's not enforcement. That's not compulsion and constraint, and that can't help them in their claims against the Secretary. I will turn briefly to the attorney general. There are, I think, two remaining issues there about why the plaintiffs believe the attorney general enforces election, these 30-some provisions of the Election Code. That's his investigatory powers and the ability under Texas law to be deputized to prosecute other offenses. Now, I'll take the investigatory bit first. This Court has strongly suggested two weeks ago in Osterwich that investigation is not enough, and there's good reason for the Court to have done that. Again, investigation without more, without some sort of subpoena or demand, it doesn't compel or constrain the plaintiffs. Indeed, an investigation would likely be internal. They may not even know about it. And so enjoining the attorney general from investigating potential wrongdoing wouldn't work here, because what they're, again, complaining about is that maybe the investigation will be passed off to another State official or local official, and that official will prosecute some offense. Again, that doesn't get them there. The second bucket for the attorney general is the provision under Texas law for him to be deputized to assist local prosecutors. And essentially what plaintiffs are arguing here is the argument that was made by the City of Austin and City of Austin against Paxton, and it is that the attorney general has a habit of prosecuting election law cases. He's expressed a, he's expressed an interest in election integrity work, and so that means he has the demonstrated willingness to enforce it. A couple of problems there. Number one, of course, is that ex-part, Zina Stevens' case from the Texas Court of Criminal Appeals prevents the attorney general from now unilaterally prosecuting election law crimes. And so the argument is that, well, maybe there's going to be a deputization from a district attorney to allow him to prosecute those crimes. Now, the problem is, of course, that turns entirely on the potential speculated actions of unnamed district attorneys. And the other thing I would note is that a deputization, let's say that an assistant attorney general is deputized, well, they're acting under the auspices of the district attorney's authority and not the attorney general's authority. And I think we can know that because let's say a district attorney asks for assistance from the attorney general. He agrees to prosecute it, help them prosecute it. If another district attorney comes in because the current one gets thrown out of office in an election, surely they could pull down the deputization. So they would be prosecuting it as the district attorney, not as the attorney general, and so I don't think deputization gets them there. That, for those reasons, sovereign immunity bars plaintiff's complaints, plaintiff's complaints under the section 1983 claims. I see my time is expiring. I'll just say, I'll touch on the standing piece in the 30 seconds I have left. But for all the similar reasons, we think the standing traceability would be another ground the court could go to resolve this appeal. As we said, the attorney general doesn't have and the secretary doesn't have the requisite connection to the enforcement of the provisions here, and so that would also doom their claims under the traceability standard of Article 3, of the element of Article 3 that, in your opinion, just a couple of days ago, Judge Oldham, you remarked on. So with that, I will, unless there are further questions, I will sit down and see you at pro. Good morning, Your Honors, and may it please the Court, Adriel Cepeda-Darriax, for the plaintiffs. The plaintiffs have divided their argument. I will briefly address plaintiff's jurisdictional arguments and why this Court lacks collateral order jurisdiction to hear this appeal, and my colleague, Ms. Martin, will then speak to the ex parte young arguments with the bulk of Appelli's time. In short, Your Honors, there is no collateral order jurisdiction here because this appeal would not end litigation and or remove the defendants from the suit, even if the defendants got everything they asked for from this Court. Counsel, what's your best case for the proposition that we would apply a different collateral order jurisdiction rule to a sovereign immunity assertion versus a qualified immunity assertion? Your Honor, I would point directly to Phillips. Phillips spoke explicitly. Obviously, it has nothing to do with qualified immunity. So my question is what is the best case? We've said at least twice in Crissy and in Loya that the same standard for collateral order jurisdiction applies to sovereign immunity and qualified immunity. Can you think of a case that says we apply a different standard for collateral order jurisdiction to qualified immunity and sovereign immunity? I cannot, Your Honor, and I will point that the case that my opposing counsel raised, that argument was not in their opening brief or their reply brief, but the rule that this Court follows in Phillips flows directly from Metcalf and Phillips, which, as Your Honor pointed out, it endorses a rule that collateral jurisdiction is proper when sovereign immunity ends all claims. And that is simply not the case here. I will point the Court to defendants' reply brief at page 10, top paragraph. In that paragraph, defendants explain two things. The first is that abrogation inquiries going to their ADA, to the plaintiff's ADA claims and the rehabilitation claims are simply not presented in this appeal. We agree. I agree with you 100 percent. But I'm going to read you a sentence from Behrens v. Pelletier. I assume you would agree with me that we're bound by Behrens, a Supreme Court decision, regardless of whether they cited it, didn't cite it, anyone knew about it. If we figured it out two weeks from now, we would still be bound by Supreme Court precedent. I assume you'd agree? I would agree with that, Your Honor. So can I read you the sentence? The Harlow right, this is the right to appeal collateral order denials in qualified immunity cases. The Harlow right to immunity is a right to immunity from certain claims, italicized in the original, not from litigation in general. When immunity with respect to those claims has been finally decided, appeal must be available and cannot be foreclosed by the mere addition of other claims to the suit. So you're totally correct about the ADA and everything else, and I don't understand why it matters. Your Honor, because I would point to Matt Caffenetti, which is an 11th Amendment sovereign immunity case. The first step in the inquiry when looking for collateral order jurisdiction, the Supreme Court has explained, is to look to the class of cases that is being presented here. We have an 11th Amendment sovereign immunity denial at the pleadings. Matt Caffenetti spoke of entitlement from immunity from a lawsuit. This Court then took Matt Caffenetti and explained that there is an entire suit standard in McCarthy and then most full-throatedly in Phillips, where it explained that a proper invocation of the sovereign immunity will be from the entire suits. And what do you make of footnote 13? Are we just going to ignore Phillips footnote 13, where Judge Elrod specifically says this is not the first time that we have asserted an inelocutory appellate jurisdiction over a suit where the defendant does not assert immunity from the entire thing? And in fact, she even points out prior to footnote 13 that there is no qualified immunity assertion in that case as to the payment claims. Your Honor, in footnote 13 in the Phillips case, first of all, Phillips reaffirms the entire suit standard. It doesn't cut around it. Phillips involved two claims, but the Court was clear that the claim that was being sought immunity from would dispense of the other claim. There was a licensing claim and a funding claim. Once the State was immune from the licensing claim, the funding claim fell out of the case. And in footnote 13, where Judge Elrod speaks precisely to BankPass, BankPass is no different. BankPass involved two different claims, but by the time it reached this Court, the one of the claims had fallen out of the case because the district court had declared judgment against the plaintiffs. I will also add that BankPass is not an Eleventh Amendment case. It involves two private toll service companies, so it cannot be part of that class of cases that informs whether this Court has collateral order jurisdiction over this specific appeal. You're making that distinction, and I understand why you're making it, but it does seem to me some of the Supreme Court cases, and maybe Metcalf itself, gets into the reason for the collateral order doctrine, but also combines it with the need to repeal from double jeopardy rulings and from other matters that are not at all sovereign immunity that have the same prudential reasons behind it. So I think your effort to create a collateral order doctrine should, to me, hold up. I mean, I'm sympathetic to it, but I don't know, what are you relying on that says sovereign immunity needs to be treated differently than other immunities, insofar as collateral order doctrine is concerned? Sure, Your Honor. Well, the Supreme Court has been clear that the collateral order doctrine is narrow, that it must be stringently applied, that this Court has said that it must be parsimoniously applied, and that it should not be expanded improperly because it essentially is a very narrow exception or a practical consideration, as the Cohen case explains, to the rule of finality. Sorry, Your Honor. But the rule is protecting the sovereign from litigating a claim. And let's say 50 percent or more of the case would be about the issue that's come up on collateral appeal, on interlocutory appeal. Why wouldn't the same reasons apply to that claim? In other words, putting the State to trial in all the intended costs on litigation when you get to final judgment and they're immune from liability from the get-go, I mean, what's the point of that? Well, Your Honor, I would just say that the State is certainly not defenseless to sever claims and move to sever claims at the district court. The Federal rules give the district courts broad latitude to do so. In fact, in many cases, I'm thinking now of the case that went up from this Court to the Supreme Court on a Bivens claim. The district court sua sponte severed a claim from which the United States was sovereign immunity, entered final judgment, and that claim went up to this Court. The others preceded a trial. So it's not as to say that the State has no maneuvers to do if it's faced with what it feels like are many different claims where it can't defend from on sovereign immunity and some that it can. It can. It just didn't do so here. And as this appeal comes to this Court, it just does not present an entire suit case. That is the rule that this Court endorsed in Phillips and that every circuit that has considered the issue has treated. The Seventh Circuit in Mercer v. Magnet, the First Circuit in Espinal Dominguez's case, these are cases we cite at page 14 and 15 of the OCA plaintiff's briefs, all endorsed this rule. Once it is properly established that there is litigation to continue, the entitlement to immunity from the lawsuit yields and any errors may be corrected on final judgment as it is in due course in most cases. I see my time is up, Your Honor. Unless you have any other questions, I will yield my time, the plaintiff's time. I know we're eating into the other side. It would be up to our Chief on how to adjust that. But let me ask you one thing. Is the burdens of trial what collateral order doctrine has to deal with? Is there a discovery, is there a way this litigation would succeed on the claims that are not subject to sovereign immunity that is different than, that would be different if the claims that have been, we hold that some of the claims are actually subject to sovereign immunity? I mean, is there any different discovery, is there any different approach that would occur in this litigation if the claims involving sovereign immunity are in or out of the case? Thank you for that question, Judge Southwick, because the answer is absolutely not. This case is, as it stands, two months away from trial, or even less than two months, two months as of yesterday. Discovery has completed. So the case has proceeded as it would have, in part because there are claims, chiefly here the ADA claims, the Rehabilitation Act claims, but also the Voting Rights Act claims. The defendants preserve that for en banc review. That will likely be at a much later date after trial. And so, Your Honor, litigation has already happened. The burdens have already happened. So the entitlement to immunity from suit has yielded as the Supreme Court's cases lay out, and the suit may proceed. Thank you, Counsel. Thank you. Good morning, Your Honors, and may it please the Court. My name is Rebecca Martin, and I am here today on behalf of the plaintiff groups to discuss the State Defendant's arguments that they do not have a sufficient connection to the enforcement of the challenged provisions of SB 1 for purposes of applying the Ex Parte Young exception to sovereign immunity and the traceability requirement for Article 3 standing. There is no question that sovereign immunity does not apply to plaintiff statutory claims arising under the Voting Rights Act, the Americans with Disabilities Act, and the Rehabilitation Act. As my colleague acknowledged, the State Defendants have clarified that the ADA and Rehabilitation Act claims are not even at issue here. So the State Defendants are proper defendants for those statutory claims, which cover all but two of the more than 30 provisions of SB 1 that are at issue on this appeal. So the issues before the Court today are whether the State Defendants are sufficiently connected to the enforcement of the challenged provisions for purposes of plaintiff's constitutional claims, as well as whether plaintiff's injuries that are not related to the ADA and Rehabilitation Act claims are traceable to the State Defendants. These two analyses are not the same, but this Court has recognized that they significantly overlap and that satisfying Article 3's standing requirement informs and, in fact, may be sufficient in and of itself to satisfy Ex Parte Young's connection to enforcement. Now, Mr. Cole discussed three categories. Can I pause you on that? Because the brief is very confusing, but what I heard you say clarifies it, and I want to make sure I'm clear on it, I understand your position. On the one hand, you say, let's talk about Ex Parte Young, let's talk about Ex Parte Young, let's talk about Ex Parte Young, don't talk about standing. But then in other parts of the brief, you say, well, the standing thing overlaps with Ex Parte Young, so we can talk about standing. So are you telling to tell us that we can, in fact, think about all of the Article 3 issues that the State has raised and that you've objected to, or are you saying ignore the Article 3 issues that the State has raised and just focus on the Ex Parte Young question that gives rise to interlocutory appellate jurisdiction? Your Honor, the Lupe plaintiffs did not intend to take a position that was contrary to the other plaintiffs in the group. We did not have an opportunity to fully consider the jurisdictional arguments before submitting our brief. Having since had that opportunity, we agree. The issue is, if the Court is going to take them, then the plaintiffs have satisfied both Ex Parte Young and standing requirements. I'm sorry, you agree with whom? You agree that we can consider all of it? No. We agree with our colleagues that the partial assertion of a sovereign immunity defense does not fall within the extraordinarily narrow collateral order doctrine. I'm sorry, I'm asking a different question. I'm talking about Article 3 standing. So am I supposed to think about Article 3 standing now or not? Yes or no? No. No. Okay, so you have authority today to represent on behalf of all of the plaintiffs in this case. The answer is no, notwithstanding the fact that some have said yes. Your Honor, that argument was handled by my colleague. I'm here today to talk about standing and sovereign immunity at the substantive level. Okay, but we're not going to talk about standing because the answer to that is we don't talk about standing, we only talk about Ex Parte Young. If Your Honors are going to disagree with my colleague, then I am here today to talk about the substance of the standing argument. We believe, we agree with my colleague that the Court should not take it, but if you are going to, I'm happy to discuss the traceability argument. Very good. Turning to the order in which Mr. Cole raised them, this Court has already held that traceability and the connection to enforcement for purposes of Ex Parte Young are satisfied by the Secretary's duty to prescribe official forms that local officials must use. In Texas Democratic Party v. Abbott, the issue was voters under 65 wanted to be able to access the right to vote by mail. In order to do that, they had to check a box on the official form that would allow them, that would grant them eligibility. That was the challenge issue. So it was not, as Mr. Cole characterized, just an issue with the form. They were trying to get access to the right to vote. The same issue here is that issue here. The Court held in Texas Democratic Party v. Abbott that the Secretary had a sufficient connection to enforcement of the challenge provisions based on her ability to constrain or compel local officials, based on the changes that she made to the form. And for standing purposes, because she would be required to correct that form if the judiciary invalidated the age-based option, that was sufficient traceability. The same applies to the challenge provisions in Article V and VI, pursuant to which the Secretary has made changes to existing forms and promulgated new forms. In all events, those forms are either going to have to be corrected or rescinded based on what the judiciary does with respect to the challenge provisions. Counsel, how many of your claims are foreclosed now by Osterwich? I don't believe any of the claims are foreclosed by Osterwich, Your Honor. The way I took your response to the 28J letter is that some of them were. It was just that things like, for example, the training program for poll watchers and this thing about forms and rules that we were just talking about, those preserved. No, Your Honor. Because those aren't addressed in Osterwich. We can talk about whether the rationale of the decision forecloses them. Osterwich considered the training and advisory duties found under the election code. Yes, so that's what I was confused by. So Osterwich talks about the training duties and says that's not sufficient. And then in the 28J letter you say, oh, but our training programs are different, and I'm not sure I understand how. Training programs are different. The training programs here are required by SB 1. The Secretary is required under SB 1 to create a training program that is in fact mandatory for poll watchers. The Secretary is also required to provide a certificate of completion for poll watchers who complete the training. That certificate of completion provided by the Secretary must be provided by a poll watcher before they can be accepted for service and before they're even eligible to go. So there is a gatekeeping role that the Secretary serves through this training program that is specifically designed by SB 1. And as we know also, the Secretary has the duty and even the ability to report election code violations, which includes the crimes here that plaintiffs allege will prohibit poll workers from constraining unruly poll watchers. And so the Secretary creating a training program and a certificate requirement for poll watchers abridges your right to vote how? If, for example, the Secretary is enjoined from enforcing these requirements. The training program. Let's just talk about that one for a second. Sure. The training program, as I'm sure you can understand, covers things like where poll watchers can stand, what they can observe, what kinds of activities they can observe, and how close they can be to people. So if the Secretary is enjoined from instructing poll watchers that they can stand close enough to see and hear the election activity, that will absolutely address plaintiffs' injuries of fear from being harassed by poll watchers. So that is entirely consistent with Texas Democratic Party v. Abbott. The changes that the Secretary must make as a result of being enjoined from enforcing the challenge provisions will have a direct impact on plaintiffs' injuries. How far back in the but-for chain of causation does Ex parte Young let us go? I'm kind of curious. Could we sue more people? Could we sue, for example, the Texas legislature or the bill sponsor? Because without that, then there wouldn't have been this provision in the bill about training programs. And without that, there wouldn't be the training program. Without that, there wouldn't be the certification requirement. Without that, there wouldn't be the poll watcher. Without the poll watcher, there wouldn't be the overhearing the conversation. Without overhearing the conversation, there wouldn't be the person who was exercising fear. And I'm wondering if we could go even further than that. Could we go back to the interest groups who proposed the idea or people who testified in support of it in front of the legislative committee? How far back in the but-for chain can we go? Fortunately, we do not need to decide that today because the Secretary is not so far removed. The Secretary is the one responsible for prescribing the training program. The Secretary is required for certifying who may become a poll watcher. And the Secretary will have to amend that training program based on the actions the court takes with respect to the challenge provisions. So this is not something that is so far attenuated that we can't really tell who or what is going to happen when. This is at most one or two steps removed from plaintiff's actual injuries, which is more than permissible under this court's precedent for purposes of Ex Parte Young. Moving on to the sort of rules and checklists that the Secretary is required to prescribe, Mr. Cole described them as sort of assistance or guidance. But that is not my understanding of the rules. This court promulgates rules governing briefs and provides a checklist to help attorneys comply with those rules. Those are not optional. Those are mandatory. So when the Secretary is prescribing rules or authorized to prescribe rules, those are binding on the local officials. And whether or not somebody decides to follow them does not take it out of Ex Parte Young. So looking at Article 2, and even in Morrison v. Livingston, this court held that the statutory language that an agency shall adopt policies was sufficiently clear to make that agency responsible for the enforcement and administration of that challenge provision. And that is what we have in Article 2, and that is also what we have elsewhere in the Election Code for the requirement that the Secretary prescribe rules and a checklist to assist presiding judges with the policies and procedures required at the opening and closing of a polling place. As the district court noted, that necessarily includes where and when polls can be open, which is the challenge provisions in Article 3. With respect to the civil and criminal penalties, the so-called referring and reporting, what's important to remember about SB 1 is as the state defendants acknowledge in their brief, SB 1 was, according to them, a direct reaction to a patchwork of varying applications of the Election Code by local officials. The stated intent of SB 1 is to ensure uniformity and consistency in the application of the Election Code across Texas, which, by the way, echoes the Secretary's role in ensuring uniformity in the conduct of elections. So the way that the legislature sought to ensure that uniformity is by inserting state-level officials, namely the Secretary and the Attorney General, to enforce SB 1's provisions from start to finish. Can I ask a question about that? I'm not sure I understand. I take your point and I understand, like, when you look at the bill text, it makes some sense in particular as to the Attorney General, what you're saying. But after the Court of Criminal Appeals has said that the Attorney General can't enforce the criminal provisions anymore, I'm not sure. I mean, it's interesting. It reminds me of the Whole Woman's Health, or I'm sorry, whichever the name of the case was, the case where the Supreme Court of the United States sent it back and a panel of our courts certified the question to the state courts to figure out, you know, what were the actual enforcement policies of the Texas Medical Board. And once the state courts say, well, in fact, there's none, then that sort of answers the Ex parte Young question, doesn't it? What I think is important here is that if you're looking at the complaint, the complaint allegations, which must be accepted as true for purposes of this appeal at the motion to dismiss phase, is that the complaint shows that the Attorney General has, can, and will investigate and enforce the challenge provisions of SB 1. Looking at his past conduct, there is a press release cited in the complaint, page 6614 of the record, footnote 32, where the Attorney General, in fact, partnered with the Gregg County District Attorney to prosecute a so-called voter harvesting scheme. Vote harvesting is a standalone crime under Article 7.04 of SB 1. So these are not a different set of statutes, a different circumstances, as in some of the precedent that this court has decided. This is the same stuff. Talking about how he can enforce it, the Secretary still has statewide authority and still, as Mr. Cole acknowledged, may prosecute these crimes at the request of local district attorneys. Moving on to will, even on the Attorney General's website this morning, which is also cited in our complaint, it is a key priority of the Attorney General to investigate and prosecute upon request allegations of voter fraud. This is something the Attorney General has done, can do, and will do. And at the pleading stage, that is more than sufficient to satisfy Ex Parte Young. I see that I am about 12 seconds left, so if Your Honors have further questions, I'm happy to address them. Can I just ask, I'm not sure I got, I wanted to make sure you got the whole answer out before I asked the follow-up, which is, I assume you're just saying the CCA decision is not relevant. Not to SB 1. Thank you, Your Honors. Just a couple of responses, maybe two on the merits and then two on, or three on the merits, two on the appellate jurisdiction issue, if I might. Let me start with the training program for poll watchers. I think the easiest way to understand our arguments with respect to this training program, which I don't really understand to differ from any of the things that the Court has previously addressed in Osterwich or in Tara or Richardson, if the district court enjoined the, well, let's say the district court enjoined the secretary from promulgating a training program, that doesn't resolve the injuries that plaintiffs complain of, because they're saying they're worried that a poll watcher is going to intimidate somebody at the polling place and that they might be, there might be a prosecution. But the conduct at the polling place is managed by a presiding judge or an early voting clerk, and the person that would prosecute one of those criminal law violations would, of course, not be the attorney general. After Stevens, it would be a district attorney. So it's not clear how enjoining the secretary from merely promulgating a training program is going to remedy the harm they allege that is the enforcement of these criminal provisions of law against them. The same is true for the checklist that the secretary could provide to the presiding judge. Just because a district court might enjoin, let's say, the secretary from promulgating this checklist, well, that doesn't mean that the presiding judge can, therefore, sort of authorize mobile voting under Section 3.12 and 3.11 of SB 1 or motor voting under 3.04. That's an independent legal obligation that the presiding judge has, and that is irrespective of whatever the secretary does or doesn't do. And that's what they're complaining of. They're not complaining about a training program. They're not complaining about a polling place checklist. They're complaining about the enforcement of the substantive provisions of SB 1 against them, let's say, at the polling place on a particular day or in some later-in-time prosecution. I'll go to the forms. I didn't hear anything on the forms about Richardson, which I think is the key case here, that the most recent guidance from this Court that interprets TDP and does make the distinction between challenges on the one hand to the forms themselves, which I think your opinion, the text of your opinion, Judge Southwick, does focus on that, and on the other hand, which what we have here is a challenge to the way in which local officials use the form. Again, their complaints are replete with allegations that what they're concerned about is, to quote the, say, Lupe complaint at paragraph 158, and this is 6-6-4-8 of the record, SB 1's requirements to provide additional information on mail ballot applications and carrier envelopes will injure Lupe's members by causing the rejection of their mail ballots when they make inadvertent clerical errors or where the clerk, the clerk lacks ID information in the voter's record on file. So what they're complaining about is the rejection of the mail-in ballots, and it's very clear, very clear now, especially with SB 1, that the early voting clerk is the one who deals with those ballots. The, on the reporting of violations, again, Stevens is relevant here, and I haven't heard any defense of why investigation constitutes compulsion or constraint, ergo enforcement under this Court's precedence. Indeed, Ostrowich very strongly suggests that investigatory powers are not compulsion or constraint. I'll go briefly one or two points on the appellate jurisdiction piece. The entire suit standard that my friend on the other side of the site appears to have been derived from, in the Planned Parenthood case, from McCarthy. It turns out McCarthy uses the phrase entire suit one time in the procedural history. It didn't really even delve into the appellate jurisdiction issues. Metcalfe and Eddy doesn't use that phrase at all. And so I think it's, you were saying earlier, Judge Southwick, one of the purposes of sovereign immunity is to preserve the dignity of the states and force them from being hailed into court and being subjected to discovery, and the Russell case confirms that. And so those interests are preserved here. And the other circuit cases they cite, I'll just say briefly, three of them involved in a situation where the state defendants asserted immunity, not from suit. They actually conceded they were amenable to suit, but from particular strains of damages. The other case from the Seventh Circuit was a federal sovereign immunity case from 1984. Judge Easterbrook there was at pains to distinguish that case as a federal sovereign immunity case. It was also a bankruptcy case, and we know from Katz that the bankruptcy clause abrogates sovereign immunity. So with that, if there are no further questions, I will sit down. Thank you.